**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| _____ | § | |
| IN RE TEXAS PRISON HEAT | § | MDL Docket No._____ |
| LITIGATION | § | |
| _____ | § | |

# EXHIBIT 2 TO MOTION OF DEFENDANTS FOR TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

## *HINOJOSA* COMPLAINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RAMONA HINOJOSA, individually as a wrongful death beneficiary and as the heir to the estate of ALBERT HINOJOSA | § § § | |
| PLAINTIFF | § § | CIVIL ACTION NO. 2:13-cv-319 |
| | § § | |
| v. | § | JURY DEMANDED |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, EILEEN KENNEDY, ERNEST GUTERREZ, JR., and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § | |
| DEFENDANTS | § § | |

## PLAINTIFF'S COMPLAINT

Plaintiff, the surviving mother of the at least the fourteenth man to die from heat stroke during the past few years in a patently dangerous Texas Department of Criminal Justice ("TDCJ") prison, files this complaint to prevent more men from dying of heat stroke in the TDCJ system, and in particular, at the brutally hot TDCJ Garza West and to seek redress for her son who died there.

### STATEMENT OF CLAIMS

1.  Prisoners regularly suffer in extreme indoor temperatures at the Garza West Unit in Beeville, Texas. Mrs. Ramona Hinojosa's beloved son, Albert Hinojosa, suffered so severely he died there.

2.  Mrs. Hinojosa brings claims on behalf of the Estate of Albert Hinojosa, as she is the sole heir-at-law to Mr. Hinojosa and as a statutory wrongful death beneficiary.

3. Plaintiff claims the Defendant individuals are liable, under 42 U.S.C. §1983, for violating her son's constitutional rights under color of law, in violation of the Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment.

4. Plaintiff further claims TDCJ and University of Texas Medical Branch ("UTMB") caused her son's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the ADA Amendments Act ("ADAAA"), 42 U.S.C. §12131 *et seq.*, and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), and §1343 (civil rights).

6. Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1), as Defendant UTMB is based, and operates, in this district, the Garza West Unit where all relevant events occurred is in the division, and all Defendants reside in this state.

## PLAINTIFF

7. Ramona Hinojosa is Albert Hinojosa's mother and sole surviving heir. She sues in her individual capacity and as the sole heir-at-law to Hinojosa's estate and as a statutory beneficiary under the Texas Wrongful Death Act. Hinojosa died intestate, and there were no probate proceedings arising from his death, as none were necessary. She is a resident of Nueces County, Texas.

## DEFENDANTS

8. Brad Livingston is the executive director of TDCJ. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and

contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Livingston is a resident of Huntsville, Texas, in Walker County.  He can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

9.    Rick Thaler was the director of TDCJ's Correctional Institutions Division at the time of Hinojosa's death, and managed all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, and can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

10.  William Stephens was the deputy director of the Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his

individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, and can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

11. Eileen Kennedy was the regional director for TDCJ's Region IV, and supervises fifteen prisons, including the Garza West Unit. As regional director, she is responsible for the supervision of all personnel at the Garza West Unit. Kennedy was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Kennedy resides in Bee County, Texas. She can be served with process at 965 Ofstie Street, Beeville, TX 78102-8986.

12. Defendant Ernest Guterrez, Jr. was the warden at the Garza West Unit when Hinojosa died, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served with process at 4250 Highway 202, Beeville, TX 78102.

13. Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Garza West Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is sued in his individual capacity for punitive and compensatory damages. He can be served with process at 2201 Market

4

Street Galveston, TX 77555.

14. The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Garza West Unit, a public facility with programs and services for which Hinojosa and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. It can be served process by serving Brad Livingston, its executive director, at 861-B, IH-45 North, Huntsville, TX 77320.

15. The University of Texas Medical Branch, located in Galveston, is a component of the University of Texas system. UTMB's high-ranking policymakers, including Dr. Murray, reside and work in Galveston. Through its Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including prisoners at the Garza West Unit. UTMB is a recipient of federal funds, and is sued for declaratory, and compensatory relief under federal law. It can be served process by serving its president, David L. Callender, at 301 University Blvd., Suite 6.100, Administration Building, Galveston, TX 77555-1006.

FACTS

**Extreme Temperatures are Killing Texas Prisoners**

16. According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Albert Hinojosa, died at TDCJ's brutally hot Garza West Unit.

17.  Like most other TDCJ units, the Garza West Unit inmate living areas are not air conditioned, and apparent indoor temperatures routinely exceed 100 degrees. These temperatures last late into the night, providing no relief to prisoners. Even early in the very early morning, indoor apparent temperatures are sweltering.

18.  As each of the Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2012, temperatures this elevated cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

19.  In fact, TDCJ and UTMB incorporated this chart, prepared by the National Oceanic and Atmospheric Administration, into agency policies well before 2012.

## Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 126 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

### Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity
▨ Caution   ▨ Extreme Caution   ▪ Danger   ■ Extreme Danger

20.   The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

21.   The indoor apparent temperatures routinely reach the red "extreme danger" zones indoors at the Garza West Unit. According to NOAA, when the apparent temperature reaches "extreme danger," heat stroke is "imminent." Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

22.   It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like diabetes or hypertension, or who take certain medications, like antipsychotics or diuretics, are much more vulnerable to extreme temperatures. While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people with these medical conditions and disabilities. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

23.   Since 2007, at least fourteen men have died in TDCJ prisons from heat-related causes:

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|------|---------------|------------|-------------|-------|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Garza West | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found at 3:30am |
| Kenneth Wayne James | 52 | Garza West | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Garza West | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Diabetic, schizophrenic, and obsess, died at transfer facility, found shortly after midnight |

24. In fact, it is likely that there were more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists, and even more individuals died in the heat from causes where heat was a contributory factor.

8

25. These fourteen men all shared certain characteristics. Most took antipsychotic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Many arrived in non-air-conditioned TDCJ facilities, like the Garza West Unit, shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night, or were found dead early in the morning. And they all died in late July and August – the hottest days of the Texas summer.

26. Two of these men, including Mr. Hinojosa, lived in prisons in TDCJ's Region IV – where Kennedy is the regional director. As the regional director, Kennedy reviewed reports on each prisoner's death. And Defendants Thaler, Stephens, and Livingston knew of the ten deaths from heat stroke in 2011, and of Mr. Adams' death from heat stroke just a few weeks before Mr. Hinojosa died. Yet they did nothing to ensure prisoners like Hinojosa received accommodations, a timely intake physical, or implemented procedures to protect him from the deadly heat.

27. Even though ten men died of heat stroke in 2011, the Defendants made no changes to their operation of the Garza West Unit. In fact, high-level TDCJ officials did not consider these deaths a problem. In fact, in the face of these deaths, one official, who was responsible for overseeing prisons where eight previous deaths occurred, testified TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, Defendants took no action to protect future prisoners, like Hinojosa, in the face of TDCJ's obviously inadequate procedures.

28. Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke were regularly discussed at meetings Thaler and Stephens held

with their deputies, including Kennedy. Even though the existing policies were obviously inadequate, and did nothing to cool the housing areas, Thaler, Stephens, and Kennedy continued to follow the same deadly course of conduct. Air conditioning or otherwise cooling the Garza West Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

29. This is all the more shocking as TDCJ purchases and maintains climate-controlled swine barns to house pigs raised for slaughter as part of TDCJ's agricultural program.

30. Nor did Executive Director Livingston take steps to cool the non air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years. In fact, even today Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions. But he approved cooling measures for pigs TDCJ raises for slaughter.

31. UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and screening materials, even as patients under its care died from hyperthermia. Dr. Murray is responsible for ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, that infirmaries at units, including the Garza West Unit, are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not

subjected to dangerous conditions as a consequence of their health issues and medical needs.

32.   Despite having this responsibility, Dr. Murray, on behalf of UTMB, has been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.   In fact, Dr. Murray knows that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from hypertension, depression, mental illness, and who are over forty years of age. Likewise, Dr. Murray, as the chief physician for UTMB concerning correctional care, knows that prisoners with such conditions are endangered if placed into brutally hot conditions. And he and UTMB knew of the pattern of deaths by heat stroke in TDCJ prisons where UTMB was providing care to prisoners.

33.   Likewise, Dr. Murray has long known that TDCJ does not air condition most inmate living areas and has even given press tours in which he described cells as blazing hot in summer and bitter cold in winter.   Moreover, as part of his duties as head of correctional care for UTMB, Dr. Murray has personally examined nearly all of the facilities he is responsible for providing care to and, upon information and belief, has visited transfer facilities such as the Garza West Unit.   Murray is also, of course, well aware of the extremely hot and humid conditions that regularly present themselves each summer in Texas. Dr. Murray was thus aware that in July and August 2011, the Garza West Unit's housing areas were extremely hot and dangerous.

34.   These hazardous conditions serve no penological purpose.

**The Garza West Unit is Especially Deadly**

*The Garza West Unit's Prisoner Housing is Not Air Conditioned or Cooled*

35.  Though extreme indoor temperatures at the Garza West Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Kennedy, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Garza West Unit.

36.  The Garza West Unit's windows are sealed shut, and cannot be opened to provide additional ventilation. The prison housing areas are like an oven.

37.  Moreover, Defendants TDCJ, Livingston, Thaler, Stephens, Kennedy and Guterrez have chosen not to take such action even though they know many prisoners have medical conditions that make the extreme heat deadly.

38.  There are some parts of the Garza West Unit where prisoners could live, at least until they receive the critical intake physical to identify which prisoners suffer from heat-sensitive medical conditions. But TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray, do not take any steps to house prisoners with heat-sensitive conditions in those areas.

39.  Additionally, certain areas, like the offices of Livingston, Kennedy, Stephens, Thaler, and Guterrez, are air-conditioned – a comfortable 75 degrees. TDCJ even air-conditions the armory at the prison because it considers possible damage to its weaponry more important than possible, or even likely, death to the inmate population.

40.  Despite their knowledge of the dangers temperatures above 90° Fahrenheit pose to prisoners, TDCJ and UTMB policies only provide protections from heat to inmates performing forced outdoor labor. For example, if a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." TDCJ's policy, however, makes *no* accommodations

for prisoners' housing assignments, or locations where they are required to live, even though temperatures in living areas routinely reach the "extreme danger" zone. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

41. Similarly, Dr. Murray and UTMB have formulated forced labor policies designed to minimize possible heat exhaustion and heat stroke among inmates. However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the Garza West Unit and other transfer facilities routinely exceed 100 degrees in the summer, Dr. Murray has not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat.

42. UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies do not contemplate special housing for prisoners with heat-sensitive disabilities.

43. The Executive Defendants also chose not to provide prisoners at the Garza West Unit, including Hinojosa, opportunities to cool off in an air-conditioned environment. Though some parts of the Garza West Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners were not given a chance to cool off.

44. As a consequence, inmates with diabetes, hypertension and depression, as well as inmates on antipsychotic drugs or diuretics, as well as obese people, at risk are regularly housed in extreme temperatures and in danger of suffering heat stroke.

13

45.   From 2007 to the present, at least fourteen inmates have died from heat stroke due to extreme heat, because they are housed inside dorms that TDCJ does not air conditioned or otherwise cool.  Despite the fact that inmates are dying at an alarming rate from heat stroke, Murray and UTMB have done nothing to try and protect the weakest inmates TDCJ houses.

46.   And despite the fact that more than eleven prisoners have died from heat stroke in the past two years, high-ranking TDCJ executives have said they consider adding any air conditioning or other cooling to TDCJ's prisons a waste of money.

47.   But, TDCJ does climate control some facilities – and even spent $750,000 to install mister systems to cool the "swine barns" that house pigs the prison system's agricultural program raises for slaughter.

> *People with Medical Conditions That Decedents Suffered From Are Especially Vulnerable to Extreme Temperatures*

48.   TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

49.   TDCJ and UTMB policies specifically acknowledge certain medical conditions like diabetes, cardiovascular disease and psychiatric conditions affect heat tolerance.

50.   TDCJ also advises its employees that an increased risk of heat stroke occurs when people suffer from certain medical conditions, like diabetes and hypertension, are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and antipsychotics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhumane conditions, Defendants know that prisoners with these identified medical conditions are the weakest

of the weak and at heightened risk of death from heat.

51. Unfortunately, many TDCJ inmates have had to suffer through these inhumane conditions, including Hinojosa and the other men who have died.

52. TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy, Guterrez and Murray know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury and death.

*Prisoners at the Garza West Unit – A Transfer Facility - Are Not Acclimated to Extreme Temperatures*

53. The Garza West Unit is a transfer facility, where people are processed into the prison system. Hinojosa, like most TDCJ prisoners, arrived at the transfer facility from county jails.

54. People whose bodies are not acclimated to the heat are at much greater risk of death. In fact, TDCJ and UTMB policies recognize "acclimatizing staff and [prisoners]" as necessary to prevent heat stroke. But when the body is exposed to extreme temperatures without acclimation, the risk of injury or death markedly increases. Yet UTMB and TDCJ take no steps to accommodate prisoners with known heat-related disabilities, such as Hinojosa.

55. In contrast to TDCJ facilities, Texas county jails are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE §259.160. Thus, when prisoners arrive from temperature-controlled jails to the brutally hot Garza West Unit, the Defendants know they are at heightened risk of heat-related injury or death.

56.   Many of the prisoners who have died of heat stroke actually spend only a few days in TDCJ custody. The two prisoners who died in 2007, for example, spent less than a week at the Byrd Unit before the heat killed them.

57.   Indeed, Hinojosa spent just a few days at the Garza West Unit before he died.

*Garza West Unit Prisoners Cannot Access Fans, Cups, and Shorts*

58.   Not only is it brutally hot and difficult to acclimate, inmates at transfer facilities also cannot immediately access the prison commissary pursuant to TDCJ policy. Thus prisoners cannot even purchase items to help combat the heat – like fans, light-weight clothing and shorts, and even cups to drink water from. Until a prisoner can access the commissary, he cannot even get a cup to drink water, much less shorts to wear or a fan to try and cool the air.

59.   Moreover, Defendants do not even permit personal fans at the Garza West Unit.

60.   And not only are prisoners deprived of cups at the Garza West Unit, Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures indoors. TDCJ policy requires officers only to bring one large jug per fifty-four prisoners to the prisoner living areas (at most) three times a day. Throughout the system, and at Garza West, in particular, the jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and are frequently filled with lukewarm water.

61.   Thus, the grossly inadequate measures TDCJ purports to rely on to help prisoners cope with heat were unavailable at the Garza West Unit.

*TDCJ and UTMB Fail to Timely Identify Heat-Sensitive Medical Conditions*

62.     Just as importantly, it can take up to ten days for prisoners to receive an intake physical when they come into TDCJ custody. The intake physical is critical, because it is the first opportunity for UTMB and TDCJ to identify and treat prisoners' heat-sensitive medical problems. At the Garza West Unit, and throughout TDCJ facilities it serves, Dr. Murray knows UTMB fails to even immediately check to see if a prisoner suffers from a heat-sensitive medical condition. Thus, UTMB and TDCJ do not know they need to provide any accommodations to a specific prisoner, such as additional observation by correctional officers, rapid treatment when a problem is identified, or placement in cooler, safe confines.

63.     Critically, restricted housing is not assigned until after a prisoner receives the intake physical. Thus, even if TDCJ were providing protective housing for prisoners with heat-sensitive disabilities, it would not provide this service until after the intake physical was completed.

64.     As a consequence of this policy, UTMB and TDCJ routinely fail to make sure prisoners receive these essential physical examinations promptly, even during the extremely hot summer months. This loophole leaves inmates with heat sensitive conditions and disabilities, such as the fourteen men who died, including Hinojosa, in grave danger.

65. TDCJ also know how important the physicals are concerning such medical conditions. TDCJ will not even allow a prisoner to labor outside until the prisoner has had the intake physical. Until UTMB conducts the physical, newly arrived prisoners are especially vulnerable to death because they receive no accommodations for their heat-sensitive disabilities.

66. And despite knowing that prisoners like Hinojosa and the other men who died were in grave danger, TDCJ fails to house newly-arrived prisoners, who are awaiting a UTMB intake physical, in the air-conditioned parts of the prison or rotate prisoners, who have not had their physicals, through the air-conditioned areas to provide some respite. Moreover, they fail to do this despite having access to prisoners' medical records, and knowing such accommodations are necessary.

67. To put it simply, TDCJ officials, such as Kennedy, Thaler, Stephens, Guterrez, Murray and Livingston, know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners, yet they have done nothing to correct it.

*The Garza West Unit Does Not Have Around the Clock Medical Staff*

68. Moreover, Dr. Murray and UTMB choose not to employ any medical staff at the Garza West Unit between 6:00 p.m. and 9:00 a.m., even though over 2,200 men are housed there every night and significant numbers (greater than 10%) suffer from hypertension or diabetes, take medications for serious mental illnesses, or are otherwise at greater risk from the extreme heat – especially when first acclimating to such harsh temperatures.

69. Livingston, Murray, and UTMB made this decision for financial reasons, despite knowing it placed inmates at risk during the evening and the middle of the night, and at grave risk in emergency situations where medical care was immediately needed.

70. As a consequence, vital medical care was delayed and/or denied to Hinojosa.

*Correctional Officers at the Garza West Unit are Inadequately Trained*

18

71. Because the apparent temperatures are so elevated, it is imperative TDCJ's low-level employees recognize heat-related illnesses and provide prisoners with emergency medical care when needed. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A memo devoid of solutions or real instruction is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated or emphasized after Mr. Shriver and Mr. Robles died in 2007 - or, shamefully, after the ten prisoners died in 2011, and Mr. Adams died on August 3, 2012.

72. UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though, when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

73. As the wardens and regional director, respectively, Guterrez and Kennedy are directly responsible for training the front-line officers charged with protecting prisoners' lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate training. Each failed to provide meaningful training, and many people died as a consequence.

*When Men Died in 2007, TDCJ and UTMB Failed and Refused to Make Changes*

74. Two of TDCJ and UTMB's victims died at another TDCJ transfer facility in 2007 – the Byrd Unit. The first prisoner to die, James Shriver, was at the Byrd Unit less than 24 hours before he died. Though he had served several years in prison, he came to

Byrd on the afternoon of August 7, 2007, from an air-conditioned TDCJ inpatient mental-health facility. Shortly before 5:00 am the next day, officers found him dead in his cell.

75.   Less than a week later, a second man died of heat stroke at the Byrd Unit. Dionicio Robles also came to the Byrd Unit from an air-conditioned TDCJ inpatient mental-health facility. He arrived at the Byrd Unit on August 3, 2007. He was dead less than ten days later. He was also found dead in his cell shortly before 5:00 am.

76.   Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

77.   Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including the Defendants – all of whom knew about the deaths. But even though two men died under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they continued to operate TDCJ with individuals in its care to temperatures they knew endangered human life.

78.   Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

*As Men Died in 2011, TDCJ and UTMB Still Failed and Refused to Make Changes*

79.   The first TDCJ prisoner confirmed to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk at the Hutchins Unit, another TDCJ transfer facility on July 22, 2011. He was hospitalized until life-support was withdrawn on July 28, 2011.

20

80. Mr. McCollum had not received an intake physical from UTMB, and had been unable to acclimate his body to the increased heat. He was left to die.

81. Douglas Hudson suffered a heat stroke on July 24, 2011 at the Gurney Unit. When he received medical attention at the prison his body temperature was 105 degrees. He was eventually taken by ambulance to Palestine Regional Medical Center, but died on July 25, 2011.

82. Later that day, Thomas Meyers, 46, died at the Coffield Unit from heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention.

83. The next day, Robert Webb, 50, died at the Hodge Unit from heat stroke. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him very susceptible to heat stroke.

84. Later that week, Alexander Togonidze, 44, died of a heat stroke at the Michal Unit. Mr. Togonidze had even been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

85. That same day, Charles Cook, 53, collapsed and died from a heat stroke at the Hodge Unit, and Michael Martone, 57, died at the Huntsville Unit from heat stroke.

86. A few days later, Kelly Marcus, 36, died from heat stroke at the Connally Unit – one of the prisons Kennedy supervises.

87. On August 13, 2011, Kenneth Wayne James died at the Gurney Unit. He had not had an intake physical.

88.  Once again, as after prior deaths, Livingston, Thaler, Stephens, Kennedy and Guterrez failed and refused to make changes necessary to prevent heat deaths.

89.  Despite these ten deaths in 2011, Dr. Murray and UTMB continued to house vulnerable inmates in extremely hot temperatures without any protections. And he did this knowing that some areas of TDCJ units, including at the Garza West Unit, have air conditioned spaces available.

90.  Almost one year later, on August 3, 2012, Rodney Adams, 45, died at the Gurney Unit from heat stroke. He only arrived the day before his death, and had not had an intake physical.

91.  After at least thirteen men were killed before him, Hinojosa died on August 27, 2012.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

92.  Livingston, Thaler, Stephens, Kennedy, Guterrez, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed and refused to take reasonable steps to protect the health and safety of prisoners.

93.  And Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray all knew inmate living areas at the Garza West Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 90 degrees indoors.

94.  Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray knew extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with hypertension and depression in extremely hot facilities like the Garza

West Unit. TDCJ's policies and practices, which Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray implemented (and could have changed), make no accommodation for people with hypertension or depression during periods of extreme temperatures.

95.    Though Livingston, Thaler, and Stephens work in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months. Guterrez and Kennedy worked at the Garza West Unit, or in nearby Beeville, every day, and knew about the extreme temperatures the area experiences each summer, and the extreme heat and humidity in August 2012.

96.    UTMB executives, including Murray and senior physician Charles Adams, work in Galveston, and also experience the same extreme temperatures during the Texas summer.

97.    Additionally, Kennedy, Guterrez, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months. Incredibly, despite their knowledge of these dangers, TDCJ has no policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas.

98.    While TDCJ acknowledges the dangers of heat to prisoners, TDCJ does not provide for any way to protect a prisoner with heat-sensitive medical conditions from extreme temperatures.

99.    Moreover, while Stephens and Thaler claim to remind wardens and regional directors to take heat-safety precautions, they do no such thing. Livingston, Thaler, Stephens, Kennedy and Guterrez know the measures allegedly taken are inadequate, but

they have taken no action to improve TDCJ's response to heat-related emergencies even
after the epidemic of heat-related deaths that preceded Hinojosa's.

100. High-level TDCJ officials have also been sued before about these conditions.
In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District
observed prisoners were dying of heat-related causes as far back as 1999. *See Ruiz v.
Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

101. In 2005, an inmate at the Garza East Unit, a prison adjacent to the Garza
West Unit, filed a lawsuit complaining about the extreme indoor temperatures. The Garza
East Unit is virtually identical to the Garza West Unit. Though the prisoner suffered no
serious injury, the Fifth Circuit ruled "temperatures into the nineties and hundreds are
allegations that are sufficiently serious to" violate the Eighth Amendment. *Valigura v.
Mendoza*, 265 F. Appx. 232, 236 (5th Cir. 2008).

102. Likewise, Livingston was a named defendant in *Blackmon v. Kukua* –
another lawsuit challenging the extreme conditions at the Garza East prison. In
*Blackmon*, Livingston filed an answer making specific admissions and denials in April
2010, and admitted "the dorm areas where the inmates are housed [at the Garza East
Unit] are not air conditioned." Mr. Blackmon complained he was exposed to apparent
temperatures that reached 130° indoors at the Garza East Unit. *Blackmon* went to trial in
February 2011, over a year-and-a-half before Hinojosa's death.

103. High-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr.
Charles Adams, a chief UTMB physician and Murray's deputy, testified the extreme
temperatures did not violate Mr. Blackmon's rights, despite knowing as a doctor that
extreme heat endangers many prisoners. He denied any problem existed, and flippantly

24

testified at trial "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away." In other words, Murray and UTMB – in the face of people dying from heat stroke at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

104. Murray was well aware of this and agreed with Dr. Adams despite knowing about the dangers extreme heat posed. As a result, UTMB providers at all prisons, including the Garza West Unit, continued to house inmates vulnerable to the heat in dangerously hot temperatures during the summer months without any housing restrictions.

105. In fact, after at least fourteen people have died from heat stroke in TDCJ units in which UTMB provides health care, Murray, UTMB, TDCJ and the other defendants continue to turn a blind eye and expose the most vulnerable to the dangers of extreme heat.

106. In 2011, over a year before Hinojosa died, State Representative Sylvester Turner, the former chair of the Texas Criminal Justice Subcommittee, wrote a letter to Livingston expressing his concern about the high temperatures in TDCJ prisons, that "temperatures inside cells have reached as high as 120 degrees during the day and do not fall below 100 degrees at night." He asked TDCJ to take "any and all preventative measures … to ensure that inmates and guards inside TDCJ do not suffer."

107. Livingston instructed his surrogates, including Thaler, to write back to Rep. Turner, but failed and refused to make any changes to TDCJ's operations.

108. Livingston was also sued in *McCollum v. Livingston*, a wrongful death case that was filed a few weeks before Hinojosa's death. Mr. McCollum died after suffering a heat stroke at TDCJ's Hutchins Unit – another transfer facility.

109. Likewise, in summer 2012, before Hinojosa died, there was intense media coverage of the extreme temperatures in Texas prisons. The *New York Times*, *Houston Chronicle*, and *Fort Worth Star Telegram* all editorialized TDCJ should not expose prisoners to these extreme conditions. But Defendants did nothing to cool down the Garza West Unit and left inmates, including Hinojosa, in danger.

110. As the conditions at the Garza West Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Hinojosa, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed, and continue to pose, a life-threatening health risk.

111. Yet, rather than seek to have the housing areas cooled by air conditioning, a cooling alternative, or to make accommodations for inmates with heat-sensitive disabilities, like Hinojosa, to cool down, or to make sure inmates with serious medical conditions such as diabetes or hypertension were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat.

112. TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Kennedy, and Guterrez, routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison. These Defendants reviewed the EAC reports for all

of the heat-related deaths described herein. TDCJ also reviewed the autopsy reports performed by UTMB pathologists, and discussed them at high-level meetings before Hinojosa's death.

113. UTMB, TDCJ, Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Garza West Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Guterrez, Kennedy, and Murray were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

114. Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

115. At the time Hinojosa died, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray are not entitled to qualified immunity.

116. The conditions at the Garza West Unit result in gratuitous pain and suffering for all prisoners, and pose an imminent danger of serious physical illness, injury, or death to Hinojosa, as well as to prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, inmates in TDCJ custody.

**Albert Hinojosa was Disabled Under Federal Law**

*Hypertension*

117. Hinojosa suffered from hypertension, a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

118. As Defendants well know, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

119. Diuretic medications are frequently used to treat hypertension. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. UTMB and TDCJ policies recognize diuretics increase a patient's risk of heat stroke.

120. Beta blockers are also used to treat hypertension. These drugs reduce the body's ability to sweat, which is necessary to dissipate heat. An inability to perspire normally substantially increases a person's risk for heat-related illnesses and death.

121. As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limited the operation of one's respiratory, circulatory, and cardiovascular systems.

*Depression*

122. Hinojosa suffered from serious depression, a chronic mental illness caused

28

by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

123.  UTMB policy recognizes patients taking medications to treat depression are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

124.  Hinojosa was prescribed Prozac (fluoxetine) to treat depression. Prozac is a selective serotonin reuptake inhibitor (SSRI), a class of drugs

*Schizophrenia*

125.  Hinojosa was also diagnosed with schizophrenia, a chronic brain disorder. It causes people to hear voices and hallucinate, and experience intense paranoia. It can affect a person's ability to think, talk, sleep, concentrate, and communicate. It impairs the operation of the brain and neurological system.

126.  Schizophrenia is treated with antipsychotic drugs, which Hinojosa was taking. These medications are known to interfere with the body's ability to dissipate heat, and make people more vulnerable to heat stroke. UTMB policy recognizes people taking these medications are at increased risk.

*Diabetes*

127.  Hinojosa had Type II Diabetes. Diabetes is a chronic disease caused by an insulin imbalance that affects the endocrine, digestive, circulatory, and nervous systems. Insulin is a hormone produced by the pancreas to control blood sugar.

128.  Diabetes impairs the body's ability to adjust to increases in temperatures by

affecting diabetics' ability to sweat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

129. Diabetes can also reduce blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

130. UTMB's policies identify diabetes as a condition affects heat tolerance.

131. TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy and Guterrez, know that many prisoners with hypertension, diabetes, schizophrenia, and depression, such as Hinojosa, live in Texas prisons.

132. Here, TDCJ and UTMB discriminated against Hinojosa, by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Hinojosa access to TDCJ facilities, including safe housing.

**Albert Hinojosa's Death**

133. In the 28 days before Mr. Hudson's death, the temperature at the Garza West Unit exceeded 95 degrees Fahrenheit on 27 days. The day before he died, the temperature soared over 100 degrees.

134. Hinojosa arrived at the Garza West Unit shortly before he died. He suffered from hypertension, diabetes, depression and schizophrenia, and was obese.

135. On August 29, 2012, shortly after midnight, a prisoner told an officer working in Hinojosa's dorm that he fell out of his bed and was suffering convulsions.

136. The officer came to Hinojosa's bunk, and found him laying on the floor. His skin was hot to the touch, and he was unresponsive.

137.  The officer immediately called her supervisor. Because there was no 24-hour medical staff at the prison, the supervisor called 911.

138.  The ambulance arrived around 1:30 am, and rushed Hinojosa to the hospital. But it was too late. He was pronounced dead at 1:50 am. He was only 44 years old.

139.  Though it was late at night when Hinojosa suffered the heat stroke, the indoor heat index was still 92 degrees. At the time, though it was after midnight, it was actually hotter indoors than outside, where the heat index was "only" 86.

140.  An autopsy, after ruling out all other causes, found Hinojosa died of hyperthermia. The UTMB pathologist concluded Hinojosa "was vulnerable to the effects of environmental hyperthermia due to pre-exisiting natural disease, and likely suffered a seizure followed by fatal cardiac arrhythmia."

## CAUSES OF ACTION

### A. EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Murray, Kennedy and Guterrez Only, in Their Individual Capacities) (42 U.S.C. §1983)

141.  Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

142.  By subjecting Hinojosa to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray acted with deliberate indifference to Hinojosa's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

143.  Further, Dr. Murray, and the practices and policies for which he is responsible, (including not placing housing restrictions on inmates vulnerable to the heat,

not providing intake physicals for inmates when they first arrive for extended periods of time despite the dangers they face, not providing medical care on site from 6:00 p.m. to 9:00 a.m. despite knowing the dangers extremely hot conditions present, having licensed vocational nurses providing treatment when they are not competent to do so, and inadequately training staff to recognize the signs of heat stroke and the immediate need for treatment), is deliberately indifferent to inmates vulnerable to heat generally and to the decedents in this case specifically.

144.   The individual Defendants failure to stop these dangerous practices (all of which they actually knew of at the time of Hinojosa's death at the Garza West Unit) endangered Hinojosa and violated his rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, proximately causing his death.

145.    Accordingly, the individual defendants are liable to the Plaintiff under 42 U.S.C. § 1983.

## B.  AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT, AND REHABILITATION ACT
### (As to Defendants TDCJ and UTMB Only)

144.  TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

145.  Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq.*

146.  Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperature actually violates the Eight and Fourteenth Amendments of the U.S. Constitution.

147.  The Garza West Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Hinojosa was otherwise qualified to participate in the programs and services at the Garza West Unit, provided by TDCJ and/or UTMB.

148.  For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Hinojosa was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities.

149.  Defendants TDCJ and UTMB knew Hinojosa suffered from hypertension, diabetes, schizophrenia and/or depression, and was prescribed medications to treat his disabilities. Despite their knowledge, TDCJ's officers and UTMB's employees

33

intentionally discriminated against him, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that untimely ended their lives.

150. As alleged above, TDCJ and UTMB failed to and refused to reasonably accommodate Hinojosa, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

151. As shown above, TDCJ and/or UTMB failed, and refused, to reasonably modify their facilities, services, accommodations, and programs to reasonably accommodate the deceased's disabilities. These failures and refusals caused his death.

152. Hinojosa died as a direct result of TDCJ and UTMB's intentional discrimination. The Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

## DAMAGES

153. Mrs. Hinojosa is entitled to compensatory and punitive damages against the Defendant individuals in the maximum amounts allowed by law.

154. Mrs. Hinojosa is entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by the ADA, ADAA, and Rehabilitation Act.

155. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to, and the wrongful death of Albert Hinojosa, the Plaintiffs assert claims under 42 U.S.C. §1983 , the ADA, ADAAA, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

156. More particularly, Mrs. Hinojosa, as heir at law to the Estate of Albert Hinojosa, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

157. Further, Mrs. Hinojosa, in her individual capacity asserting wrongful death claims, has incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Albert Hinojosa; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

158.    Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to recover attorneys' fees and costs.  Plaintiff also requests attorneys' fees, costs, and expenses against TDCJ and UTMB for their ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A. Award compensatory damages, against Defendants to Plaintiffs;

B. Award punitive damages against the Defendant individuals, only, under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the Plaintiff;

C. Find that Plaintiff is the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses;

D. Prejudgment and postjudgment interest at the highest rate allowable by law, and,

E. Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Dated: July 24, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.   512-623-7727
 Fax.  512-623-7729

By _____ /s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

ATTORNEY FOR PLAINTIFF

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
RAMONA HINOJOSA, individually as a wrongful death beneficiary and as the heir to the estate of ALBERT HINOJOSA

## DEFENDANTS
BRAD LIVINGSTON, individually and in his official capacity, RICK THALER, WILLIAM STEPHENS, EILEEN KENNEDY, ERNEST GURERREZ, JR. OWEN MURRAY, TDCJ, and UTMB

**(b)** County of Residence of First Listed Plaintiff    NUECES
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    WALKER
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeff Edwards, Edwards Law, 1101 E. 11th Street, Austin, TX 78702

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C.§1983; Americans with Disabilities Act; Rehabilitation Act

Brief description of cause:
prisoner wrongful death from heat stroke

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE             DOCKET NUMBER

DATE
10/15/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE