UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RENE ARTURO HINOJOSA, as representative of the ESTATE OF RAMONA HINOJOSA, and the ESTATE OF ALBERT HINOJOSA | § § § | |
| PLAINTIFF | § | CIVIL ACTION NO. 2:13-cv-319 |
| | § | |
| | § | |
| | § | JURY DEMANDED |
| v. | § | |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, EILEEN KENNEDY, ERNEST GUTERREZ, JR., LANNETTE LINTHICUM, JENNIFER BUSKIRK, ADELE QUINTANILLA, RUBEN VILLEGAS, EISMAEL RUIZ and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § | |
| DEFENDANTS | § | |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff, a survivor of the fourteenth man to die from heat stroke in a patently dangerous Texas Department of Criminal Justice prison, files this complaint to seek redress for his uncle who died at the brutally hot Garza West Unit.

STATEMENT OF CLAIMS

1.  Prisoners regularly suffer in extreme indoor temperatures at the Garza West Unit in Beeville, Texas. Rene Arturo Hinojosa's uncle, Albert Hinojosa, suffered so severely he died there.

2.  Rene Arturo Hinojosa brings claims as the representative of the Estate of Albert Hinojosa, and the estate of his deceased grandmother, Ramona Hinojosa.[1]

---

[1] Mrs. Hinojosa originally filed this lawsuit, but passed away while this suit was pending. An administration of both estates is pending in the Nueces County probate court.

3.   Plaintiff claims the Defendant individuals are liable, under 42 U.S.C. §1983, for violating his Albert Hinojosa's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment.

4.   Plaintiff further claims TDCJ and University of Texas Medical Branch ("UTMB") caused his brother's death by failing to provide reasonable accommodations for Albert Hinojosa's disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the ADA Amendments Act ("ADAAA"), 42 U.S.C. §12131 *et seq*., and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act").

JURISDICTION AND VENUE

5.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), and §1343 (civil rights).

6.   Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1), as Defendant UTMB is based, and operates, in this district, and the Garza West Unit, where all relevant events occurred, is in the division, and all Defendants reside in this state.

PLAINTIFF

7.   Rene Arturo Hinojosa is Albert Hinojosa's nephew. He is the representative of the Estate of Albert Hinojosa. Albert Hinojosa died intestate. An administration of Albert Hinojosa's estate is pending in Nueces County, Texas. Rene Arturo Hinojosa is a resident of Nueces County, Texas, and has been appointed the Estate's administrator.

8.   Ramona Hinojosa was the mother of Albert Hinojosa. She brought claims in her individual capacity and as the sole heir-at-law to Albert Hinojosa's estate and as a

statutory beneficiary under the Texas Wrongful Death Act. While this lawsuit was pending, she passed away. Rene Arturo Hinojosa is her grandson, and has been appointed her estate's administrator, which is pending in Nueces County, Texas.[2]

DEFENDANTS

9.   Brad Livingston is the executive director of TDCJ. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Livingston is a resident of Huntsville, Texas, in Walker County.  He has been served with process and appeared in this litigation.

10.   Rick Thaler was the director of TDCJ's Correctional Institutions Division at the time of Hinojosa's death, and managed all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

11.   William Stephens was the deputy director of the Correctional Institutions

---

[2] Mrs. Hinojosa's son and Albert's brother, Rene Torres Hinojosa, is the sole heir to both estates. Because Rene Torres Hinojosa is legally disqualified from administering the estates, Rene Torres Hinojosa's son, Rene Arturo Hinojosa, serves as the representative of both estates.

Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

12.   Eileen Kennedy was the regional director for TDCJ's Region IV, and supervises fifteen prisons, including the Garza West Unit. As regional director, she is responsible for the supervision of all personnel at the Garza West Unit. Kennedy was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Kennedy resides in Bee County, Texas. She has been served with process and appeared in this litigation.

13.   Defendant Ernest Guterrez, Jr. was the warden at the Garza West Unit when Hinojosa died, and was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

14.   Lannette Linthicum, M.D., is TDCJ's chief medical officer, and supervises medical care provided to prisoners at all TDCJ facilities. Linthicum was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She

is sued in her individual capacity for punitive and compensatory damages. Linthicum resides in Walker County. She can be served with process at 2 Financial Plaza, Huntsville, TX 77340.

15.   Kathryn Buskirk, M.D., is the director of quality monitoring and compliance for TDCJ's Health Services Division. She supervises the provision of health care to inmates at all TDCJ facilities. Buskirk was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Burkirk resides in Walker County. She can be served with process at 2 Financial Plaza, Huntsville, TX 77340.

16.   Eismael Ruiz was a lieutenant at the Garza West Unit. He supervised correctional staff and inmates at the prison. Ruiz was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Ruiz resides in Bee County.

17.   Ruben Villegas was a correctional sergeant at the Garza West Unit. He supervised correctional staff and inmates at the prison. Villegas was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Villegas resides in Bee County. He can be served with process at 4250 Hwy. 202, Beeville, TX 78102.

18.   Adele Quintanilla was a correctional officer at the Garza West Unit. She supervised inmates at the prison. Quintanilla was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Quintanilla resides in Bee County.

19.  Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Garza West Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

20.  The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Garza West Unit, a public facility with programs and services for which Hinojosa and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. TDCJ has been served with process and appeared in this litigation.

21.  The University of Texas Medical Branch, located in Galveston, is a component of the University of Texas system. UTMB's high-ranking policymakers, including Dr. Murray, reside and work in Galveston. Through its Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including prisoners at the Garza West Unit. UTMB is a recipient of federal funds, and is sued for declaratory, and compensatory relief under federal law. TDCJ has

been served with process and appeared in this litigation.

FACTS

**Extreme Temperatures are Killing Texas Prisoners**

22.   According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Albert Hinojosa, died at TDCJ's brutally hot Garza West Unit.

23.   As every Defendant knows, the Garza West Unit's inmate living areas, like the vast majority of TDCJ prisons, are not air conditioned or climate controlled. As a predictable and known result, apparent indoor temperatures routinely exceed 100 degrees during the hot Texas summers.

24.   The ventilation system at the Garza West Unit, like at most TDCJ prisons, does not actually lower the indoor temperatures. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning. The Defendants all know that the ventilation system does not appreciably decrease the temperatures indoors.

25.   Likewise, the Garza West Unit's metal and concrete construction causes it to trap heat during the day. Thus, temperatures inside the prison remain high even late at night when the outdoor temperature may go down.

26. Defendant Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

27. In fact, all of the Defendants know there is little difference between indoor and outdoor summer temperatures at TDCJ prisons, and for extensive periods of the summer months, the temperatures (according to inmates and the basic tenets of thermodynamics) are hotter inside than outside – much the way a garage is often hotter and stuffier than the outside air in the summer.

28. As each of the executive-level Defendants (Livingston, Thaler, Stephens, Kennedy, Linthicum, Murray, and Buskirk) have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2012, temperatures this elevated cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

29. In fact, TDCJ and UTMB incorporated this chart, prepared by the National Oceanic and Atmospheric Administration, into agency policies well before 2012.



**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution  ☐ Extreme Caution  ☐ Danger  ☐ Extreme Danger

30.  The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

31.  The indoor apparent temperatures at the Garza West Unit routinely reach the orange "danger" and red "extreme danger" zones. According to NOAA, when the apparent temperature reaches the "danger" zone, heat stroke becomes "possible with prolonged exposure." When the apparent temperature reaches the red "extreme danger" zone, heat stroke is "imminent." Yet the Executive Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

32.  Moreover, the NOAA chart is designed to predict the risk to people who *do not* suffer from medical conditions or take medications that increase their susceptibility to

heat-related injuries. These charts predict the risk to "healthy" people, not people, like Albert Hinojosa, who have an increased risk of heat-related illness or injury due to medical conditions, or medications.

33.   It was well known to TDCJ and UTMB leadership, including the executive-level Defendants, that people with certain medical conditions, like obesity, diabetes or hypertension, or who take certain medications, like antipsychotics or diuretics, are much more vulnerable to extreme temperatures. While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people with these medical conditions and disabilities. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

34.   In fact, Thaler had emailed TDCJ and UTMB staff instructing them that prisoners taking certain psychiatric medications were at increased risk of heat-related illness. But despite this knowledge, he took no steps to lower the temperatures in the housing areas. Thaler also discussed this danger with Stevens and Livingston, as well as Murray, Buskirk, and Linthicum. None of them did anything to lower the indoor housing temperatures.

35.   Since 1998, at least twenty men have died in TDCJ prisons from heat-related causes:

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diurectics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications, |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 29, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

36.  In fact, it is likely that there were more heat-related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists, and even more individuals died in the heat from causes where heat was a contributory factor.

37.  These twenty men all shared certain characteristics. Most took antipsychotic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Many arrived in non-air-conditioned TDCJ facilities, like the Garza West Unit, shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night (when it was hotter inside the housing units than outdoors), or were found dead early in the morning. And they all died in late July and August – the hottest days of the Texas summer.

38.  Two of these men, including Mr. Hinojosa, lived in prisons in TDCJ's Region IV – where Kennedy is the regional director. As the regional director, Kennedy reviewed reports on each prisoner's death.

39.  Likewise, Defendants Thaler, Stephens, Linthicum, Buskirk, and Livingston knew of the ten deaths from heat stroke in 2011, and of Mr. Adams' death from heat stroke just a few weeks before Mr. Hinojosa died. Yet they did nothing to ensure prisoners like Hinojosa received accommodations, a timely intake physical, or implemented procedures to protect him from the deadly heat.

40. In fact, TDCJ's designated representative testified TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths."

41. Thus, TDCJ, Guterrez, and Kennedy took no action to protect future prisoners, like Albert Hinojosa, at the Garza West Unit, in the face of TDCJ's obviously inadequate procedures and the dangerous conditions of confinement.

42. Kennedy's direct supervisors, Livingston, Thaler, and Stephens, were similarly unconcerned. The deaths of prisoners system-wide were regularly discussed at meetings Thaler and Stephens held with their deputies, including Kennedy. Even though the existing policies were proven and obviously inadequate and the conditions in the prisons were known to be dangerous, Thaler, Stephens, and Kennedy continued to follow the same deadly course of conduct. Air conditioning the Garza West Unit or other prisons was never even discussed. Moving prisoners with heat-sensitive medical conditions or disabilities to air-conditioned or safe prisons was never contemplated or implemented.

43. In 2009, other TDCJ officials asked Livingston, Linthicum, and the "executive director's office" "what are we doing about these deaths?" But neither Livingston nor Linthicum took action to upgrade (or even recommend upgrading) TDCJ's facilities to protect inmates from these deadly conditions. In fact, no one did a single thing to lower the housing temperatures for prisoners at the Garza West Unit (or any other prison).

44. While acknowledging their awareness of the high number of deaths by hyperthermia, UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and screening materials, even as patients under its care died from hyperthermia. Dr. Murray supervised medical care at TDCJ facilities serviced by UTMB, including the Garza West Unit. His job is to provide adequate health care to prisoners, ensure that prisoners have access to adequate health

care, that infirmaries at prisons – including the Garza West Unit – are adequately staffed to handle medical conditions and emergencies that will occur, and for formulating policies to ensure prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a result of their disabilities and serious medical needs.

45. Similarly, Dr. Linthicum and Dr. Buskirk are employees of TDCJ's Health Services Division. They supervise the care UTMB provides to prisoners and communicate with the Executive UTMB and TDCJ Defendants. The Health Services Division has, by state law, the authority and obligation to ensure prisoners have access to care, to monitor the quality of care, investigate medical grievances, and conduct operational reviews of health care services at TDCJ facilities. As such, Dr. Linthicum and Dr. Buskirk also knew that infirmaries were inadequately staffed, that there were no procedures to protect prisoners at risk of heat-related illness, that newly arrived prisoners would wait days before seeing a doctor, and that the temperatures inside TDCJ prisons during the summer were so high and dangerous, inmates' health was placed at great risk.

46. Despite having these responsibilities, Dr. Murray, on behalf of UTMB, and Dr. Linthicum and Dr. Buskirk, on behalf of TDCJ, have been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat. In fact, Dr. Murray, Dr. Linthicum, and Dr. Buskirk know (according to their own internal policies) that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from hypertension, depression, mental illness, and who are over forty years of age. Likewise, Dr. Murray, Dr. Linthicum, and Dr. Buskirk know that

prisoners with these medical conditions are endangered when placed into brutally hot conditions.

47.   Likewise, Dr. Murray, Dr. Linthicum, and Dr. Buskirk have long known that TDCJ does not air condition most inmate living areas. Dr. Murray has even given press tours in which he described cells as "blazing hot" in the summer.  Moreover, as part of their duties, Dr. Murray, Dr. Linthicum, and Dr. Buskirk have personally examined nearly all of the facilities they are responsible for providing care to and, upon information and belief, have visited transfer facilities such as the Garza West Unit.

48.   Dr. Linthicum, Dr. Buskirk, and Dr. Murray routinely receive reports about inmates becoming sick because of the heat each summer. In fact, Dr. Linthicum and Dr. Buskirk have maintained a spreadsheet of all heat-related illnesses inmates suffered since 2010 that shows what medications heat victims were taking, where they suffered from the heat-related illness (such as the housing areas), and what medical conditions the inmates had.

49.   Dr. Linthicum, Dr. Murray, and Dr. Buskirk are also, of course, well aware of the extremely hot and humid conditions that regularly present themselves each summer in Texas. They were aware that in August 2012, as were all Defendants, the Garza West Unit's housing areas were extremely hot and dangerous.

50.   These hazardous conditions serve no penological purpose.

**The Garza West Unit is Especially Deadly**

*The Garza West Unit's Prisoner Housing is Not Air Conditioned or Cooled*

51.   Though extreme indoor temperatures at the Garza West Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Kennedy,

Stephens, Thaler, Linthicum, Buskirk, and Livingston, took no steps to air condition or otherwise cool prisoner housing areas at the Garza West Unit prior to Albert Hinojosa's death.

52.  Each of these officials, and all the executive-level Defendants, knew the Garza West Unit's windows are sealed shut, and cannot be opened to provide additional ventilation. In many ways, the conditions are akin to being locked inside a car with the windows closed during the summer.

53.  Moreover, Defendants TDCJ, Livingston, Thaler, Stephens, Kennedy, Linthicum, Buskirk, and Guterrez have chosen not to take such action even though they know many prisoners have medical conditions that make the extreme heat deadly, including, but not limited to, diabetes, obesity, hypertension, and conditions requiring treatment with psychotropic medications.

54.  There are some air-conditioned parts of the Garza West Unit where prisoners could live, at least until they receive the critical intake physical to identify which prisoners suffer from heat-sensitive medical conditions. But TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray, do nothing to house prisoners with heat-sensitive conditions in those areas.

55.  Additionally, certain areas, like the offices of Livingston, Kennedy, Stephens, Thaler, Linthicum, Buskirk, and Guterrez, are air-conditioned – a comfortable 75 degrees. TDCJ even air-conditions the armory at the prison because it and each of the Executive Defendants considers possible damage to its weaponry more important than possible, or even likely, death to the inmate population.

56.  Despite their knowledge of the dangers temperatures above 90° Fahrenheit pose to prisoners, TDCJ and UTMB policies only provide protections from heat to inmates performing outdoor forced labor. For example, if a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." TDCJ's policy, however, makes *no* accommodations for prisoners' housing assignments even though temperatures in living areas routinely reach the "danger" or "extreme danger" zones in the NOAA chart. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

57.  Not surprisingly, Livingston, Thaler, and Stephens have admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

58.  Linthicum, Buskirk, Kennedy, Murray, and Guterrez also know TDCJ has no written policy to address high temperatures in prison housing areas.

59.  Similarly, Dr. Murray, Dr. Linthicum, Dr. Buskirk, and UTMB have formulated work policies designed to minimize possible heat exhaustion and heat stroke among inmates performing forced labor. However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the Garza West Unit and other transfer facilities routinely exceed 100 degrees in the summer and that the non-air conditioned housing areas can be hotter than outside temperatures, Dr. Murray, Dr. Linthicum, and Dr. Buskirk have not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat.

60.  UTMB, operating under a policy developed by TDCJ, makes housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a

wheelchair, for example, should not be assigned to a top bunk. But UTMB and TDCJ policies intentionally deny this reasonable accommodation to prisoners with heat-sensitive disabilities.

61. Likewise, Livingston, Thaler, Stephens, Linthicum, Buskirk, Murray, Kennedy, and Guterrez know UTMB does not recommend special housing for prisoners with heat-sensitive medical conditions.

62. Livingston, Thaler, Stephens, Linthicum, Buskirk, Murray, Kennedy, and Guterrez also chose not to provide prisoners at the Garza West Unit, including Albert Hinojosa, opportunities to cool off in an air-conditioned environment. Though some parts of the Garza West Unit are air conditioned, such as the visitation rooms, prisoners were not given a chance to cool off there.

63. As a consequence, inmates with diabetes, hypertension and depression, as well as inmates on antipsychotic drugs or diuretics, as well as obese people, are regularly housed in extreme temperatures and in danger of suffering heat stroke.

64. Even though at least twenty inmates have died from heat stroke since 1998 due to extreme indoor temperatures, Murray, Linthicum, Buskirk, and UTMB have done nothing to protect the weakest inmates TDCJ houses from high indoor temperatures.

65. And, while Livingston, Thaler, Stephens, Kennedy, and Eason know the housing areas expose such vulnerable people to the extreme heat, and know vulnerable people remain in danger, they did nothing to lower the temperatures to a safe level or get vulnerable prisoners safe housing.

66.  Moreover, TDCJ's designated representative testified he considers adding any air conditioning to TDCJ's prisons a "waste of money," even though TDCJ knows air conditioning would have saved at least twenty lives.

67.  Livingston, Thaler, and Stephens also believe air conditioning is a waste of money, even though the agency has never studied the cost of cooling certain housing areas.

68.  Nor does it appear that Livingston, Thaler, and Stephens care about the officers working under their supervision, as they know correctional officers who work in the inmate housing areas are also exposed to the same dangerous temperatures and also routinely suffer and fall ill because of the heat.

69.  The situation is so dire that the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperatures lawsuits brought against TDCJ.

70.  The correctional officers' union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ, Livingston, Thaler, Stephens, and Kennedy have ignored or disregarded these requests for safe working conditions.

71.  But while the Executives, including Livingston, know about and ignore the hazards to prisoners and correctional officers, TDCJ officials, including Livingston, approved installing climate controlled hog barns to protect the welfare of TDCJ's pigs raised for slaughter.

72.  TDCJ has detailed policies, which Livingston approved, that require TDCJ to house pigs in safer and more humane temperatures than prisoners.  More specifically, TDCJ policy, that was approved by Livingston, requires the pigs live in a "comfortable

environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials."

73. Misters are to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable."

74. And TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort."

75. TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

76. High-ranking TDCJ officials, including Livingston's deputy, presumably with the full knowledge of Livingston, even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke.

77. Put simply, Defendant Livingston directed funds to protect pigs and chose not to direct funds to protect human prisoners in TDCJ custody and care at least as well as TDCJ's agricultural products.

78. Even Defendant Thaler acknowledged that it is unconscionable for pigs to receive greater protections from extreme temperatures than human beings.

*People with Medical Conditions Albert Hinojosa Suffered From Are Especially Vulnerable to Extreme Temperatures*

79. TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

80. TDCJ and UTMB policies specifically acknowledge certain medical conditions like obesity, diabetes, cardiovascular disease and psychiatric conditions affect heat tolerance.

81.  TDCJ also advises its employees that an increased risk of heat stroke occurs when people suffer from certain medical conditions, like diabetes and hypertension, are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and antipsychotics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhumane conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

82.  TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk and Murray know prisoners in TDCJ custody are afflicted with these disabilities, suffer in TDCJ's prisons because of the extreme temperatures every summer, and are at increased risk of heat-related injury.

*Prisoners at the Garza West Unit – A Transfer Facility - Are Not Acclimated to Extreme Temperatures They Must Endure*

83.  The Garza West Unit, as all Defendants know, is a transfer facility, where people are processed into the prison system. Albert Hinojosa, like most TDCJ prisoners, arrived at the transfer facility from an air-conditioned county jail.

84.  People whose bodies are not acclimated to the heat are at much greater risk of death. In fact, TDCJ and UTMB policies recognize "acclimatizing staff and [prisoners]" as necessary to prevent heat stroke. But when the body is exposed to extreme temperatures without acclimation, the risk of injury or death markedly increases. Yet UTMB, TDCJ, and their leadership, including all the named defendants, knew this as well.

85.  In contrast to TDCJ facilities, Texas county jails are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE §259.160.

Thus, when prisoners arrive from temperature-controlled jails to the brutally hot Garza West Unit, the Defendants know they are at heightened risk of heat-related injury or death.

86.   Many of the prisoners who have died of heat stroke actually spend only a few days in TDCJ custody. The two prisoners who died in 2007, for example, spent less than a week at the Byrd Unit before the heat killed them. Several inmates who died before Hinojosa – including Mr. Adams, Mr. McCollum, Mr. Hudson, and Mr. James – spent just a few days in custody before they died.

87.   Indeed, Hinojosa spent less than 48 hours at the Garza West Unit before he died.

*Garza West Unit Prisoners Cannot Access Fans, Cups, and Shorts*

88.   Not only is it brutally hot and difficult to acclimate, inmates at transfer facilities, including the Garza West Unit, also cannot immediately access the prison commissary pursuant to TDCJ policy. Livingston, Thaler, Stephens, Kennedy, and Guterrez know of and implemented this policy. Thus prisoners cannot even purchase items to help combat the heat – like fans, light-weight clothing and shorts, and even cups to drink water from.

89.   Moreover, Defendants do not even permit personal fans at the Garza West Unit.

90.   Thus, the Defendants knew even the grossly inadequate measures TDCJ purports to rely on to help prisoners cope with heat were unavailable at the Garza West Unit.

*TDCJ and UTMB Fail to Timely Identify Heat-Sensitive Medical Conditions*

91.     Just as importantly, it can take up to ten days for prisoners to receive an intake physical when they come into TDCJ custody, pursuant to policies drafted and/or implemented by TDCJ and UTMB.

92.     When inmates arrive in custody, an initial medical triage is performed where a licensed vocational nurse with little training asks inmates if they suffer from certain medical problems, including heat-related medical conditions. But, though inmates' medical problems (including many heat-sensitive conditions) are identified and known at triage, TDCJ and UTMB do nothing at this time to ensure that inmates with heat-sensitive disabilities receive safe housing or other accommodations for their heat-related disabilities.

93.     Rather, pursuant to TDCJ and UTMB policy, prisoners using wheelchairs or in obvious need of a bottom bunk are the only inmates who receive any accommodation for their disabilities after the triage evaluation.

94.     Other accommodations for disabilities – such as the prohibition on forced outdoor labor for heat-sensitive people – are not provided until the intake physical.

95.     The intake physical is critical, because it is the first opportunity for UTMB and TDCJ to identify and treat prisoners' heat-sensitive medical problems. At the Garza West Unit, and throughout TDCJ facilities, Dr. Murray, Dr. Linthicum, and Dr. Buskirk know UTMB fails to even immediately check to see if a prisoner suffers from a heat-sensitive medical condition.

96.     Likewise, Livingston, Thaler, Stephens, Guterrez, and Kennedy know that prisoners do not receive intake physicals until after they have been incarcerated for several days.

97.   As a consequence of this policy, UTMB and TDCJ routinely fail to make sure prisoners receive these essential physical examinations promptly, even during the extremely hot summer months. This loophole leaves inmates with heat-sensitive conditions and disabilities, such as Albert Hinojosa, in danger.

98.   And despite knowing that prisoners like Albert Hinojosa were in grave danger, TDCJ fails to house newly-arrived prisoners, who are awaiting a UTMB intake physical, in the air-conditioned parts of the prison or rotate prisoners who have not had their physicals through the air-conditioned areas to provide some respite, even though UTMB and TDCJ identify prisoners with heat-sensitive conditions at triage.

99.   To put it simply, TDCJ officials, like Kennedy, Thaler, Stephens, Guterrez, Murray, Linthicum, Buskirk, and Livingston, know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners, yet they did nothing to correct it.

*The Garza West Unit Does Not Have Medical Staff at Night*

100. Moreover, Livingston, Dr. Murray, Dr. Linthicum, Dr. Buskirk, TDCJ and UTMB *choose* not to employ any medical staff at the Garza West Unit between 8:00 p.m. and 9:00 a.m., even though over 2,200 men are housed there every night and significant numbers (greater than 10%) suffer from obesity, hypertension or diabetes, take medications for serious mental illnesses, or are otherwise at greater risk from the extreme heat – especially when first acclimating to such harsh temperatures.

101. Instead, prisoners needing after-hours medical care are evaluated over the phone by licensed vocational nurses working at the nearby McConnell Unit who are

unable to even take vital signs – including, critically, body temperature, blood pressure, and pulse rate.

102. Livingston, Linthicum, Buskirk, Murray, TDCJ, and UTMB made this decision for financial reasons, despite knowing it placed inmates at risk in the middle of the night, and at grave risk in emergency situations where medical care was immediately needed.

103. The TDCJ and UTMB employees at the Garza West Unit, including Guterrez, Quintanilla, Ruiz, and Villegas, knew there was no medical staff at the facility after 8:00 p.m., that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance, and that it could take half an hour for an ambulance to make a round-trip journey out to the Garza West Unit and back.

104. As a consequence, vital medical care was delayed and/or denied to Hinojosa.

*Correctional Officers at the Garza West Unit are Inadequately Trained*

105.  Because the apparent temperatures are so elevated, and because there are no medical staff available at night, it is imperative TDCJ's low-level employees recognize heat-related illnesses and provide prisoners with emergency medical care when needed. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A memo devoid of solutions or real instruction is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated or emphasized after Mr. Shriver and Mr. Robles died from heat stroke in 2007 - or, shamefully, after the ten prisoners died from heat stroke in 2011, or even after Mr. Adams died on August 3, 2012.

106.  UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though, when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

107.  As the wardens and regional director, respectively, Guterrez and Kennedy are directly responsible for training the front-line officers charged with protecting prisoners' lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate training, and supervise the development and implementation of training materials. Each failed to provide necessary training, and many people died as a consequence.

*When Men Died in 2007, TDCJ and UTMB Failed and Refused to Make Changes*

108. Two of TDCJ and UTMB's victims died at another TDCJ transfer facility in 2007 – the Byrd Unit. James Shriver was at the Byrd Unit less than 24 hours before he died. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007, from an air-conditioned TDCJ inpatient mental-health facility. Shortly before 5:00 am the next day, officers found him dead in his cell.

109. Less than a week later, a second man died of heat stroke at the Byrd Unit. Dionicio Robles also came to the Byrd Unit from an air-conditioned TDCJ inpatient mental-health facility. He arrived at the Byrd Unit on August 3, 2007. He was dead less than ten days later. He was also found dead in his cell shortly before 5:00 am.

110. Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

111. Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including the Defendants – all of whom knew about the deaths. But even though two men died under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they continued to operate TDCJ with individuals in its care to temperatures they knew endangered human life.

112. In fact, in 2009, Dr. Linthicum received an email from the "executive director's office" asking "if the agency has taken measure[s] to prevent further heat related deaths following these incidents?" Linthicum responded that "CID" – Thaler and Stephens' division – "had developed a working paper a few years back" that outlined how TDCJ responds to extreme temperatures. This "working paper," in reality, as was known to all of the Executive Defendants, made no changes and despite the executives' knowledge of these deaths they continued to run the agency as if it were business as usual.

113. Similarly, after the two men died in 2007, Dr. Murray, Dr. Linthicum, and Dr. Buskirk instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

*As Men Died in 2011, TDCJ and UTMB Still Failed and Refused to Make Changes*

114. The first TDCJ prisoner confirmed to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk late at night at the Hutchins

Unit, another TDCJ transfer facility on July 22, 2011. He was hospitalized until life-support was withdrawn on July 28, 2011.

115. Mr. McCollum had not received an intake physical from UTMB, and had been unable to acclimate his body to the increased heat. In prison for forging a check, he effectively received a death sentence from TDCJ.

116. Douglas Hudson suffered a heat stroke on July 24, 2011 at the Gurney Unit. When he received medical attention at the prison his body temperature was 105 degrees. He was eventually taken by ambulance to Palestine Regional Medical Center, but died on July 25, 2011.

117. Later that day, Thomas Meyers, 46, died at the Coffield Unit from heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention.

118. The next day, Robert Webb, 50, was found early in the morning, dead in his cell at the Hodge Unit from heat stroke. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him very susceptible to heat stroke.

119. Later that week, Alexander Togonidze, 44, was also found dead in his cell shortly after dawn. He also died of a heat stroke at the Michael Unit. Mr. Togonidze had even been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

120. That same day, Charles Cook, 53, collapsed and died from a heat stroke at the Hodge Unit, and Michael Martone, 57, died at the Huntsville Unit from heat stroke.

121. A few days later, Kelly Marcus, 36, died from heat stroke at the Connally Unit – one of the prisons Kennedy supervises.

122. On August 13, 2011, Kenneth Wayne James died at the Gurney Unit. He had not had an intake physical.

123. Once again, as after prior deaths, Livingston, Thaler, Stephens, Kennedy and Guterrez failed and refused to make changes necessary to prevent heat deaths.

124. Despite these ten confirmed heat-stroke deaths in 2011 – all of which were caused by the extreme heat inside the housing areas – Dr. Murray, Dr. Linthicum, Dr. Buskirk, TDCJ and UTMB did not change their policies or procedures. Rather, they continued to house vulnerable inmates in extremely hot temperatures without any cooling protections, and continued to ignore the need to protect vulnerable prisoner who could not (or who had difficulty) acclimating from the air-conditioned county jails from which they came to the brutally hot TDCJ prisons.

125. As a consequence of this indifference, almost one year later, Rodney Adams, 45, died at the Gurney Unit from heat stroke. He only arrived the day before his death, and had not had an intake physical.

126. Then, a few weeks after that, Albert Hinojosa suffered a painful heat stroke and died at the Garza West Unit.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

127. Livingston, Thaler, Stephens, Kennedy, Guterrez, Murray, Linthicum, Buskirk, TDCJ and UTMB knew indoor apparent temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed and refused to take reasonable steps to protect the health and safety of prisoners.

128. And Livingston, Thaler, Stephens, Kennedy, Guterrez, and Murray all knew inmate living areas at the Garza West Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 90 degrees indoors.

129. Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray knew extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with hypertension and depression in extremely hot facilities like the Garza West Unit. TDCJ's policies and practices, which Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray implemented (and could have changed), make no accommodation for people with hypertension, diabetes, obesity, schizophrenia, or depression during periods of extreme temperatures.

130. Though Livingston, Thaler, Linthicum, Buskirk, and Stephens work in Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months. Guterrez and Kennedy worked at the Garza West Unit, or in nearby Beeville, every day, and knew about the extreme temperatures the area experiences each summer, and the extreme heat and humidity in August 2012. Upon information and belief, all of the defendants had been inside the Gurney Unit during the summer and knew it to be extremely hot.

131. Guterrez, Ruiz, Villegas and Quintanilla all work at the Garza West Unit, and are well aware how hot the indoor temperatures can be.

132. Additionally, Kennedy, Guterrez, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90 degrees during the summer months.

133. UTMB executives, including Murray and senior physician Charles Adams, work in Galveston, and also experience the same extreme temperatures during the Texas summer.

134. Additionally, Kennedy, Guterrez, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months. Incredibly, despite their knowledge of these dangers, TDCJ has no policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas.

135. High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes at least as far back as 1998. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

136. While TDCJ acknowledges the dangers of heat to prisoners, TDCJ does not provide for any way to protect a prisoner with heat-sensitive medical conditions from extreme temperatures.

137. Moreover, while Stephens and Thaler claim to remind wardens and regional directors to take heat-safety precautions, they do no such thing. Livingston, Thaler, Stephens, Kennedy and Guterrez know the measures allegedly taken are inadequate, but they have taken no action to improve TDCJ's response to heat-related emergencies even after the epidemic of heat-related deaths that preceded Hinojosa's.

138. High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District

observed prisoners were dying of heat-related causes as far back as 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

139. In 2005, an inmate at the Garza East Unit, a prison adjacent to the Garza West Unit, filed a lawsuit complaining about the extreme indoor temperatures. The Garza East Unit is virtually identical to the Garza West Unit. Though the prisoner suffered no serious injury, the Fifth Circuit ruled "temperatures into the nineties and hundreds are allegations that are sufficiently serious to" violate the Eighth Amendment. *Valigura v. Mendoza*, 265 Fed. Appx. 232, 236 (5th Cir. 2008).

140. Likewise, Livingston was a named defendant in *Blackmon v. Kukua* – a second lawsuit challenging the extreme conditions at the Garza East prison. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at the Garza East Unit] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit, a fact known to Livingston. *Blackmon* went to trial in February 2011, over a year-and-a-half before Hinojosa's death.

141. Similarly, before Albert Hinojosa's death, Kennedy, Thaler, and Stephens were all aware of the Blackmon lawsuit, and knew that the agency had paid money to settle the case.

142. Despite their knowledge of the dangers extreme heat posed to prisoners, and the grave danger it posed to prisoners with Hinojosa's medical conditions and disabilities, high-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician and Murray's deputy, testified the extreme temperatures did not violate Mr. Blackmon's rights, despite knowing as a doctor that extreme heat endangers

many prisoners. He denied any problem existed, and flippantly testified at trial "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away."

143. Tellingly, Dr. Adams acknowledged in emails later that year that the prisoners needed "cooling" and that the prisoner population was vulnerable to the heat and needed to be protected. But, he, Murray and UTMB made no changes. Rather, in the face of people dying from heat stroke at alarming levels during the summer of 2011— they continued to ignore the problem and kept prisoners in grave danger.

144. Murray was also aware of the *Blackmon* allegations and the danger extreme heat posed to prisoners. But he implemented no changes.

145. Similarly, before Albert Hinojosa's death, Kennedy, Thaler, and Stephens were all aware of the *Blackmon* lawsuit and its allegations, and knew that the agency had paid money to settle the case.

146. As a result, UTMB providers at all prisons, including the Garza West Unit, continued to fail to accommodate inmates vulnerable to the heat during the summer months by providing intake physicals sooner or by recommending any housing restrictions.

147. UTMB has also testified TDCJ does not provide enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury or death.

148. TDCJ and UTMB use a Utilization Review Committee to determine which inmates are assigned the small number of climate-controlled beds.

149. Dr. Glenda Adams, one of the senior medical providers at UTMB who has

been designated as an expert witness for TDCJ, testified as follows:

> Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?

> A: Pretty much. That's a fair description.

> Q: Do you know how many of those triage beds or cells you're talking about?

> A: How many are there?

> Q: Yeah.

> A: Absolutely … there were 471 [in 2011]. We now have 481.[3]

> Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

> A: No, but it's all we have.

> Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

> A: Essentially, yes.

150.    In other words, TDCJ, UTMB, Livingston, Thaler, Stephens, Linthicum, Buskirk, Kennedy, and Guterrez knew the system did not have enough air-conditioned beds to safely house prisoners at increased risk of heat-related illness, injury or death. The Defendants know the lack of air-conditioned beds will guarantee inmates with heat-sensitive medical conditions and disabilities are exposed to dangerous conditions, that some will become sick, and some will die.

151.    TDCJ intentionally does not provide any additional air-conditioned beds. There are only 551 air-conditioned beds system-wide, severely limiting number of

---

[3] Though UTMB manages 481 beds, there are some additional beds available with TDCJ's other medical provider, the Texas Tech University Health Science Center.

prisoners with heat-related disabilities who can be accommodated.

152. In fact, after at least fourteen people have died from heat stroke in TDCJ units in which UTMB provides health care since 2007, Murray, UTMB, TDCJ and the other defendants continue to turn a blind eye and expose the most vulnerable to the dangers of extreme heat.

153. In 2011, over a year before Hinojosa died, State Representative Sylvester Turner, the former chair of the Texas Criminal Justice Subcommittee, wrote a letter to Livingston expressing his concern about the high temperatures in TDCJ prisons, that "temperatures inside cells have reached as high as 120 degrees during the day and do not fall below 100 degrees at night." He asked TDCJ to take "any and all preventative measures … to ensure that inmates and guards inside TDCJ do not suffer."

154. Livingston instructed his surrogates, including Thaler, to write back to Rep. Turner, but failed and refused to make any changes to TDCJ's operations. Their response to a state legislator was just to repeat the same steps TDCJ knew failed to prevent prisoners' deaths and knew did not reduce the temperatures in the housing areas at all.

155. Livingston was also sued in *McCollum v. Livingston*, a wrongful death case that was filed a few weeks before Albert Hinojosa's death. Mr. McCollum died after suffering a heat stroke at TDCJ's Hutchins Unit – another transfer facility. Texas and national media outlets covered this story before Albert Hinojosa died.

156. Likewise, in summer 2012, before Albert Hinojosa died, there was intense media coverage of the extreme temperatures in Texas prisons. The *New York Times*, *Houston Chronicle*, *Austin American-Statesman*, and *Fort Worth Star Telegram* all editorialized TDCJ should not expose prisoners to these extreme conditions.

157. The executive-level defendants, upon information and belief, were aware of this news coverage, and knew about the high number of hyperthermia deaths.

158. But Defendants did nothing to cool down the Garza West Unit and left inmates, including Albert Hinojosa, in danger.

159. As the conditions at the Garza West Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Albert Hinojosa, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed, and continue to pose, a life-threatening health risk.

160. Yet, rather than seek to have the housing areas cooled by air conditioning, use a cooling alternative, make accommodations for inmates to cool down, or make sure inmates with serious medical conditions such as diabetes, obesity, hypertension, schizophrenia, or depression or who were prescribed certain medications, like Albert Hinojosa, were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat.

161. TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Kennedy, and Guterrez, routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison. These Defendants reviewed the EAC reports for all of the heat-related deaths described herein. TDCJ also reviewed the autopsy reports performed by UTMB pathologists, and discussed them at high-level meetings before Albert Hinojosa's death.

162. Likewise, Murray, Buskirk, and Linthicum regularly reviewed reports of inmates' heat-related injuries, and knew inmates routinely suffered from heat-related medical conditions.

163. UTMB, TDCJ, Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Garza West Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Guterrez, Kennedy, Linthicum, Buskirk, and Murray were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

164. Despite the epidemic of heat-related deaths, the executive-level Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

165. At the time Albert Hinojosa died, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray are not entitled to qualified immunity.

166. The conditions at the Garza West Unit result in gratuitous pain and suffering for all prisoners, and pose an imminent danger of serious physical illness, injury, or death to Albert Hinojosa, as well as to prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, inmates in TDCJ custody.

**Albert Hinojosa was Disabled Under Federal Law**

*Hypertension*

167.  Albert Hinojosa suffered from hypertension, a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

168. As Defendants well know, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

169. Diuretic medications are frequently used to treat hypertension. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. UTMB and TDCJ policies recognize diuretics increase a patient's risk of heat stroke.

170. Beta blockers are also used to treat hypertension. These drugs reduce the body's ability to sweat, which is necessary to dissipate heat. An inability to perspire normally substantially increases a person's risk for heat-related illnesses and death.

171.  As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limited the operation of Albert Hinojosa's respiratory, circulatory,

and cardiovascular systems. Critically, hypertension substantially limits patients' ability to thermoregulate – the ability of the body to maintain a safe temperature.

*Depression*

172.  Albert Hinojosa suffered from serious depression, a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

173.  TDCJ and UTMB policy recognizes patients taking medications to treat depression are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

174.  Albert Hinojosa was prescribed Prozac (fluoxetine) to treat depression. Prozac is a selective serotonin reuptake inhibitor (SSRI), a class of drugs.

175.  Albert Hinojosa's depression was a serious medical condition – shortly before his incarceration in the Garza West Unit, he had been involuntarily committed to the North Texas State Hospital because he suffered from a severe mental illness and was unable to communicate, care for himself, and think.

*Schizophrenia*

176.  Albert Hinojosa was also diagnosed with schizophrenia, a chronic brain disorder. It causes people to hear voices and hallucinate, and experience intense paranoia. It can affect a person's ability to think, talk, sleep, concentrate, and communicate. It

impairs the operation of the brain and neurological system.

177.  Schizophrenia is treated with antipsychotic drugs, which Albert Hinojosa was taking. These medications are known to interfere with the body's ability to dissipate heat, and make people more vulnerable to heat stroke. TDCJ and UTMB policy recognizes people taking these medications are at increased risk.

178.  Albert Hinojosa's schizophrenia also contributed to his involuntary commitment at North Texas State Hospital, and substantially impaired his ability to think, care for himself, and communicate.

*Diabetes*

179.  Albert Hinojosa was a Type II diabetic. Diabetes is a chronic disease caused by an insulin imbalance.  Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

180.  Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

181.  Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

182.  As noted previously, Albert Hinojosa's diabetic condition, in conjunction with his obesity and hypertension, substantially limited his ability to climb, walk, stand, sweat, cool, breathe, and limited the operation of his respiratory, circulatory, endocrine,

nervous, cardiovascular, and digestive systems.

183. Diabetes also substantially limited Albert Hinojosa's ability to thermoregulate.

184. TDCJ and UTMB's policies and medical providers identify diabetes as a condition that affects heat tolerance and that renders inmates susceptible to significant injury and/or death from extremely high temperatures – like those at the Garza West Unit in August 2012.

185. The American Diabetes Association suggests that on hot days people with diabetes "stay indoors as much as possible and drink plenty of fluids" and "seek shelter if you do not have air conditioning and the heat is beginning to make you feel ill."

*Obesity*

186. Albert Hinojosa was 5' 10" tall, and weighed 370 pounds when he arrived at the Garza West Unit. Medically, he was morbidly obese. His weight was clearly outside the normal range for someone of his height.

187. His body mass index was 53, and thus greater than 40, making him more than twice his ideal weight, according to the Centers for Disease Control.

188. Albert Hinojosa's obesity likely contributed to, or was a cause of, his hypertension and diabetes, and thus affected his digestive, cardiovascular, nervous, and endocrine systems.

189. Albert Hinojosa's obesity also substantially limited his ability to thermoregulate, including his ability to sweat, and breathe.

190. TDCJ and UTMB's policies identify "people who are overweight" as being at additional risk of heat-related illness.

191. TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Kennedy, Linthicum, Buskirk, Murray, and Guterrez, know that many prisoners with hypertension, obesity, diabetes, schizophrenia, and depression, such as Hinojosa, live in Texas prisons.

192. Here, TDCJ and UTMB discriminated against Albert Hinojosa, by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services, including safe housing at the prison. The extreme heat in TDCJ facilities denies people like Albert Hinojosa access to TDCJ facilities.

**Albert Hinojosa's Death**

193. In the 28 days before Albert Hinojosa's death, the temperature at the Garza West Unit exceeded 95 degrees Fahrenheit on 27 days. The day before he died, the temperature soared over 100 degrees.

194. Albert Hinojosa arrived at the Garza West Unit on the afternoon of August 27, 2012. A UTMB nurse performed the triage and learned he suffered from hypertension, diabetes, depression and schizophrenia, and was obese. Though UTMB knew Albert Hinojosa had heat-sensitive medical conditions at this time, neither the nurse nor any UTMB provider did anything to even recommend he receive climate-controlled housing.

195. UTMB and TDCJ likewise deliberately did nothing to notify officers that Albert Hinojosa was at increased risk of heat-related illness because of his underlying medical conditions.

196. TDCJ placed Albert Hinojosa in a small dormitory housing eight men. The dorm had no windows, and, predictably, trapped the South Texas heat.

197. On August 29, 2012, shortly after midnight, a prisoner told Officer Quintanilla that Albert Hinojosa fell out of his bed and was suffering convulsions.

198. Quintanilla came to Hinojosa's bunk, and found him laying on the floor. His skin was hot to the touch, and he was unresponsive. He was incoherent and could not answer questions.

199. At that time, Quintanilla knew Albert Hinojosa was suffering a medical emergency. She knew the medical staff had all left the prison hours earlier, and that Albert Hinojosa needed immediate medical attention that no one at the prison was qualified to provide.

200. Instead of immediately calling 911, however, Quintanilla called her supervisors, Sgt. Villegas and Lt. Ruiz. At that time, TDCJ had a policy and practice that correctional officers could not call 911 without their supervisors first assessing a prisoner, even though the correctional supervisors have no medical training beyond first aid.

201. Kennedy, Stephens, Thaler, and Guterrez all knew TDCJ's policy and practice at the Garza West Unit at that time required a supervisor to assess the inmate first before calling 911, even when the prison did not have medical staff available.

202. Over the radio, Villegas and Ruiz were told Albert Hinojosa had fallen out of his bunk, was unresponsive, and was "having an emergency." Despite knowing Albert Hinojosa's situation was an "emergency," they did not call 911.

203. Each of the officers (as well as Kennedy and Guterrez) knew it would take approximately 20 minutes for an ambulance to be dispatched by 911, arrive at the prison,

and make the trip back to the emergency room, assuming the ambulance spent virtually no time actually at the prison.

204. Villegas and Ruiz went to the dormitory from their assigned posts. When they arrived, they found Albert Hinojosa laying on the floor. He was unresponsive.

205. Again, rather than immediately call 911, Villegas and Ruiz got Albert Hinojosa on a stretcher, and began taking him to the long-ago shuttered infirmary. On their way to the infirmary, they finally got on the radio and had 911 called. It had been 25 minutes since Quintanilla first found Albert Hinojosa.

206. Though Quintanilla, Ruiz, and Villegas all actually knew Albert Hinojosa needed immediate, life-saving, medical attention, they intentionally delayed treatment for his serious medical need.

207. Quintanilla, Ruiz, and Villegas failed to perform simple first aid, like packing Albert Hinojosa's body with ice, or taking him to a cool area, even though they knew he needed it.

208. The ambulance could not leave the prison until after 1:00 pm.

209. Albert Hinojosa went into cardiac arrest and died shortly after arriving at the hospital. He had been in prison less than 48 hours.

210. Though it was late at night when Albert Hinojosa suffered the heat stroke, the indoor temperature in his dorm was still 92 degrees. At the time, though it was after midnight, it was actually hotter indoors than outside, where the heat index was only 82.

211. An autopsy, after ruling out all other causes, found Hinojosa died of hyperthermia. The UTMB pathologist concluded Hinojosa "was vulnerable to the effects

of environmental hyperthermia due to pre-exisiting natural disease, and likely suffered a seizure followed by fatal cardiac arrhythmia."

CAUSES OF ACTION

### A. EIGHTH AND FOURTEENTH AMENDMENT - CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Murray, Kennedy, Linthicum, Buskirk and Guterrez Only, in Their Individual Capacities) (42 U.S.C. §1983)

212.  Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

213.  By subjecting Albert Hinojosa to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray acted with deliberate indifference to Hinojosa's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

214.  Further, Dr. Murray, Dr. Linthicum, and Dr. Buskirk, and the practices and policies for which they are responsible, (including not placing housing restrictions on inmates vulnerable to the heat, not providing intake physicals for inmates when they first arrive for extended periods of time despite the dangers they face, not providing medical care on site from 8:00 p.m. to 9:00 a.m. despite knowing the dangers extremely hot conditions present, and inadequately training staff to recognize the signs of heat stroke and the immediate need for treatment), were deliberately indifferent to inmates vulnerable to heat generally and to the decedents in this case specifically.

215.  Defendants Livingston, Thaler, Stephens, Kennedy, Guterrez, Linthicum, Buskirk, and Murray's failure to stop these dangerous practices (all of which they

actually knew of at the time of Albert Hinojosa's death at the Garza West Unit) which endangered Hinojosa and violated his rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, proximately causing his death.

216.    Accordingly, the individual defendants are liable to the Plaintiff under 42 U.S.C. § 1983.

B. EIGHTH AND FOURTEENTH AMENDMENT – DENIAL OF MEDICAL CARE
(As to Defendants Guterrez, Kennedy, Quintanilla, Villegas, and Ruiz Only, in Their Individual Capacities) (42 U.S.C. §1983)

217.    Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

218.    Quintanilla, Ruiz, and Villegas all deliberately failed to provide Albert Hinojosa medical care for his serious medical condition, causing his death. Though each Defendant observed or otherwise knew Albert Hinojosa was extremely hot, disoriented, incoherent, and had collapsed, they each deliberately ignored his condition, failing to provide him urgently needed medical care. This deliberate and knowing refusal to provide medical care proximately caused Albert Hinojosa's untimely death.

219.    Moreover, Guterrez grossly failed to supervise the officers under his command at the Garza West Unit to ensure they accommodated prisoners suffering from the heat, and immediately provided medical care to prisoners suffering emergent symptoms of heat stroke.

220.    Likewise, Guterrez, and Kennedy knew of, ratified, and otherwise approved the decision to require supervisors to evaluate prisoners (despite their lack of medical training) before calling 911 during an emergency. This practice caused unconscionable delays proximately resulting in Albert Hinojosa's death.

221.    Accordingly, the individual defendants are liable to the Plaintiff under 42 U.S.C. § 1983.

### C.  AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT, AND REHABILITATION ACT
(As to Defendants TDCJ and UTMB Only)

212.  TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

213.  Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq*.

214.  Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperature actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

215.  The Garza West Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Albert Hinojosa was otherwise qualified to participate in the programs and services at the Garza West Unit, provided by TDCJ and/or UTMB.

216.  For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Albert Hinojosa was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities.

217. Defendants TDCJ and UTMB knew Albert Hinojosa suffered from hypertension, diabetes, schizophrenia and/or depression, and was prescribed medications to treat his disabilities. Despite their knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that untimely ended their lives.

218. As alleged above, TDCJ and UTMB failed to and refused to reasonably accommodate Albert Hinojosa, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

219. As shown above, TDCJ and/or UTMB failed, and refused, to reasonably modify their facilities, services, accommodations, and programs to reasonably accommodate the deceased's disabilities. These failures and refusals caused his death.

220. Albert Hinojosa died as a direct result of TDCJ and UTMB's intentional discrimination. The Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

### D. NEGLIGENCE - PREMISES LIABILITY
(As to TDCJ)

221. Plaintiff incorporates the foregoing as if alleged herein:

222. The conditions in which TDCJ housed Albert Hinojosa at the Garza West Unit, namely the extreme heat inside the housing area, were dangerous and constitute premises liability under Texas law.

223. TDCJ controlled and maintained the Garza West Unit housing areas, TDCJ officials actually knew that conditions in the housing area were extremely dangerous and were especially dangerous for heat-vulnerable individuals like Albert Hinojosa.

224. This condition, the extreme heat inside the housing area, posed an unreasonable risk of harm to Albert Hinojosa, constituted a breach of TDCJ's duties to exercise reasonable care and protect prisoners from known dangers, and was a proximate cause of the Albert Hinojosa's death.

225. TDCJ knowingly failed to remedy the dangerous condition or warn Albert Hinojosa how to safely avoid the dangerous, extreme heat.

226. As TDCJ had actual notice that Albert Hinojosa died as a result the dangerous condition to which he was subjected, and a subjective awareness that their fault contributed to his death, TDCJ's immunity is waived.

E.        NEGLIGENCE – TEXAS TORT CLAIMS ACT
PRESCRIPTION DRUGS
(As to Defendant UTMB)

227. As described above, UTMB employees negligently used personal property, the prescription drugs prescribed Albert Hinojosa, to treat their disabilities.

228. Use of these prescription drugs was dangerous and contributed to Albert Hinojosa's death.

229. Moreover, UTMB employees knew, or should have known, that at the moment they prescribed the drugs that the medications substantially increased the Albert Hinojosa's risk of suffering a fatal heat stroke.

230. UTMB had actual notice that Albert Hinojosa died as a result of the use of the prescription drugs, and a subjective awareness that its fault contributed to Albert Hinojosa's death.

231. Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

DAMAGES

232.  Plaintiff is entitled to compensatory and punitive damages against the Defendant individuals in the maximum amounts allowed by law.

233.  Plaintiff is entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by the ADA, ADAA, and Rehabilitation Act.

234.  As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to, and the wrongful death of Albert Hinojosa, the Plaintiff asserts claims under 42 U.S.C. §1983, the ADA, ADAAA, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

235.  More particularly, Plaintiff (on behalf of the Estate of Ramona Hinojosa, and the Estate of Albert Hinojosa), asserts a survival claim on behalf of the Estate of Albert Hinojosa, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

236.  Further, Plaintiff, on behalf of the Estate of Ramona Hinojosa, asserts wrongful death claims on her behalf, as she incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past loss of companionship, society, services, and affection of Albert Hinojosa; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

237.    Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to recover attorneys' fees and costs.  Plaintiff also requests attorneys' fees, costs, and expenses against TDCJ and UTMB for her ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.  Award compensatory damages, against Defendants to Plaintiffs;

B.  Award punitive damages against the Defendant individuals, only, under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the Plaintiff;

C.  Find that Plaintiff is the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses;

D.  Prejudgment and postjudgment interest at the highest rate allowable by law, and,

E.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Dated: August 25, 2014.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.  512-623-7727
 Fax.  512-623-7729

By    /s/ Jeff Edwards      
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
SCOTT MEDLOCK
State Bar No. 24044783
SEAN FLAMMER
State Bar No. 24059754

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I certify that a copy of this document has been served on all counsel of record through the Court's electronic filing system.

By    /s/ Jeff Edwards      
JEFF EDWARDS